IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRENDA ANN SCHWARTZ and PAUL GRANT SCHWARTZ,<br><br>      Plaintiffs,<br><br>  v.<br><br>ACCURATUS CORPORATION,<br>in its own right and as successor in interest to<br>Accuratus Ceramic Corporation, and MATERION<br>BRUSH INC., c/o C T Corporation System,<br><br>      Defendants. | CIVIL ACTION<br>NO. 12-6189 |

**MEMORANDUM**

**SCHMEHL, J.**                                   **March 24, 2014**

    Plaintiffs Brenda Schwartz and her now-husband Paul bring claims for harm to Brenda they claim is the result of exposure to beryllium carried home from work on shoes and clothing by Paul and a third person who was their roommate. Defendants are two companies at which the husband and roommate worked with beryllium products. Resolution of their motions to dismiss involves choice of law issues, the viability of the "take-home" theory of negligence liability, and several potential avenues of strict liability. For reasons explained below, the Court will grant in part and deny in part the motions to dismiss. Specifically, the negligence claim is dismissed against Accuratus but may proceed against Brush; the strict products liability claim is dismissed against Accuratus and may proceed only in limited form against Brush; and the strict liability for abnormally dangerous activity claim may proceed against both Defendants.

Factual and Procedural Background

The primary Plaintiff is Brenda Ann Schwartz ("Brenda"), who allegedly suffers a variety of adverse health effects associated with chronic beryllium disease. Her husband, Paul Grant Schwartz ("Paul"), brings a loss of consortium claim. Both Plaintiffs are Pennsylvania residents. Defendants Accuratus Corporation ("Accuratus") and Materion Brush Inc. ("Brush") are two companies with plants in New Jersey manufacturing beryllium products.

As the name suggests, chronic beryllium disease results from exposure to beryllium, apparently in dust form; without undue focus on technical aspects at this stage, the factual and legal situation can be considered analogous to the more familiar issue of asbestos exposure. As with asbestos, exposure to beryllium can result from employment in facilities that work with it. However, Brenda was never employed by either Defendant; rather, she alleges she was exposed to beryllium carried home from work, on clothing and/or shoes, by Paul and a roommate named Gregory Altemose ("Altemose").

Brenda and Paul met and began dating in 1978. Paul moved in with Altemose in 1979, and Brenda spent a lot of time at their apartment. In June 1980, Brenda married Paul and moved into the apartment, where all three lived together for a time. In 1978 and 1979—that is, when Brenda was merely dating Paul and visiting the apartment—Paul worked at Accuratus. Altemose also started at Accuratus in 1978, but continued working there until the present. Therefore, beryllium from Accuratus could have reached Brenda via Paul before they were married, or via Altemose, a roommate.

From 1979 through 1987, Paul worked at Brush. In addition, in 1978 and 1979, when Paul worked at Accuratus, Brush sold beryllium products to Accuratus, which may

2

then have been used in further manufacturing processes at Accuratus. Therefore, beryllium from Brush could have reached Brenda via Paul while they were married, with Paul bringing it home directly from his employment at Brush, or via Altemose or Paul prior to the marriage bringing it home from employment at Accuratus (where at least some of the beryllium came from Brush).

Plaintiffs originally filed suit in state court. The suit named an additional Defendant, Dennis Tretter, a Pennsylvania citizen who was an Accuratus employee enforcing safety policies. On November 1, 2012, Defendants removed the action to this Court, arguing that Tretter was fraudulently joined to defeat diversity jurisdiction. Plaintiffs filed a motion to remand dealing with that issue, which Judge C. Darnell Jones denied on March 1, 2013. As discussed further below, Judge Jones's order (as well as a subsequent order denying reconsideration on April 5, 2013) examined Tretter's potential liability in a lengthy footnote and, finding none, ruled that Tretter's joinder was unfounded and jurisdiction in this Court on the basis of diversity was proper.

In accordance with Court order, Plaintiffs filed an Amended Complaint on May 2, 2013. Both Defendants moved to dismiss, although Accuratus chose not to file its own brief and instead rely on the brief submitted by Brush. The case was transferred to the undersigned on July 30, 2013, and a preliminary pretrial conference was held September 19, 2013. After the conference, the Court stayed discovery pending issuance of the present ruling on the motions to dismiss but nevertheless set discovery and other deadlines. Those deadlines are now extended by an order entered contemporaneously with this opinion.

Discussion

Plaintiffs' Amended Complaint asserts ten counts. Counts I-IV are brought by Brenda against Accuratus for negligence, strict liability for abnormally dangerous activities, strict liability for ultrahazardous activities, and strict products liability under §402A of the Restatement (Second) of Torts. Counts V-VIII are the same claims by Brenda against Brush. Count IX calls for exemplary damages across all claims, and Count X is Paul's claim for loss of consortium. The following analysis first addresses negligence, then products liability, and then abnormally dangerous/ultrahazardous activities jointly, considering the sometimes different situations of the two Defendants in each section. Choice of law is likewise addressed at least briefly within each issue in accordance with the principle of dépeçage. *See Zavecz v. Yield Dynamics, Inc.*, 179 F. App'x 116, 120 (3d Cir. 2006).

Negligence

The issue giving rise to the heated choice-of-law debate in the parties' briefs is whether the law applicable to this case imposes a duty that would allow for "take-home" liability of the sort contemplated by Brenda's claims that she, a party not employed by and with no direct relationship to Defendants, was harmed by beryllium carried home by others who were so employed. Sitting as it does in Pennsylvania, with jurisdiction by way of diversity, this Court applies Pennsylvania's choice-of-law rules. *See Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012). Under Pennsylvania choice-of-law, the court first asks whether there is an actual conflict between the laws of the states involved; if not, no analysis is necessary and the states'

laws are interchangeable. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229-30 (3d Cir. 2007). If there is a conflict, the court asks whether it is a true or false conflict or an unprovided-for situation. *Id.* at 230. If it is a true conflict, the court asks which state has the greater contacts and interest in seeing its law applied. *Id.* at 230-31. In unprovided-for situations, where neither state has an interest, traditional choice-of-law rules based on the type of action apply. *Id.* at 230 n. 9. If it is a false conflict, meaning "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's laws," the law of the state with an interest applies. *Id.* at 229-30 (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991)).

In classifying true and false conflicts and unprovided-for situations, courts look at the policies behind each state's law and may assess whether the states' laws are defendant-protecting or plaintiff-protecting, among other considerations. *See id.* at 230; *see also Panthera Rail Car LLC v. Kasgro Rail Corp.*, CIV.A. 13-679, 2013 WL 6253449 (W.D. Pa. Dec. 4, 2013) (finding, with a California plaintiff, Pennsylvania defendants, and a contract calling for Minnesota law, that Minnesota had no interest because its law protected defendants and defendants were not Minnesota residents, Pennsylvania did have an interest because its rule protected its resident defendants, and California also had an interest because its rule protected its resident plaintiff); *Davis v. Geico Gen. Ins. Co.*, 1:12-CV-2332, 2013 WL 3784264 (M.D. Pa. July 18, 2013) (explaining that if all states were understood to have a general interest in seeing their law applied, the true/false conflict analysis would be unnecessary and meaningless, and reasoning that Delaware had no interest in applying its rule preventing recovery of attorney fees to protect an out-of-state defendant insurance company); *Reinert v.*

5

*Nationwide Ins. Co.*, CIV.A. 12-1094, 2013 WL 1311097 (E.D. Pa. Apr. 2, 2013) (finding a false conflict in a suit by Pennsylvania citizens against an insurer related to a car accident that occurred in North Carolina, and defining Pennsylvania's interest as controlling insurance costs and North Carolina's interest as protecting the motoring public).

Here, the parties concede the presence of an actual conflict is at least debatable. New Jersey has allowed take-home liability in the asbestos context. *See Olivo v. Owens-Illinois, Inc.*, 895 A.2d 1143, 1149-50 (N.J. 2006). Pennsylvania has no case affirmatively providing for take-home liability, but the cases specifically denying the existence of such a duty under Pennsylvania law are not opinions from Pennsylvania's own courts. *See In re Asbestos Litig.*, CIV.A. N10C-04203ASB, 2012 WL 1413887 (Del. Super. Ct. Feb. 21, 2012) (concluding, largely because of the tenuous relationship between an employer and an employee's spouse, that "under Pennsylvania law an employer/premises owner does not owe a duty to the spouse of an employee in the take homes asbestos exposure context"); *Jesensky v. A-Best Products Co.*, No. 96-680 (W.D. Pa. Oct. 29, 2003) (finding, in an asbestos take-home case, that there was no Pennsylvania precedent for extending a duty based on premises liability to someone who had never been on the property), *report and recommendation adopted in part and rejected in part by* CIV.A. 96-680, 2004 WL 5267498 (W.D. Pa. Feb. 17, 2004), *aff'd sub nom.*, Jesensky v. A-Best Products, 287 F. App'x 968 (3d Cir. 2008). Even plaintiffs initially concede that Pennsylvania would not allow take-home liability, and though they later argue otherwise, the Court will assume for the purposes of this analysis that New Jersey and Pennsylvania do actually differ on this point.

Moving on, the Court must attempt to define the states' interests to determine whether they are truly in conflict. As noted, Pennsylvania has not spoken for itself on this issue, so its interest is at best uncertain and not particularly strong. The Delaware court that considered the issue reasoned that given the limited or non-existent relationship between an employer landowner and employees' spouses or others that may come into contact with employees, the "economically infeasible" consequences of imposing potentially limitless take-home liability make such a duty unreasonable. *See In re Asbestos Litig*. It is reasonable to conclude that if Pennsylvania would indeed reject take-home liability, it would do so in order to curtail the unpredictable and possibly vast costs that would otherwise be borne by entities such as Defendants Accuratus and Brush. That is, Pennsylvania law embodies a defendant-protecting rule. New Jersey, of course, has spoken on this issue. The *Olivo* court noted that the greater flexibility of New Jersey's premises liability law is designed to effect its "fundamental purpose . . . to deter conduct that creates an unreasonable risk of injury to others." 895 A.2d at 1148 (quoting *Kuzmicz v. Ivy Hill Park Apartments, Inc.*, 688 A.2d 1018, 1030 (N.J. 1997) (Stein, J., dissenting)). The New Jersey interest, therefore, is not merely plaintiff-protecting but also risk-deterring.

New Jersey's plaintiff-protecting interest is not active in this case involving Pennsylvania plaintiffs, but its interest in deterring dangerous conduct by these particular New Jersey-located defendants, who might pose a risk to the New Jersey public, is fully present. Juxtaposition of this express New Jersey conduct-deterring rule with Pennsylvania's silent defendant-protecting rule reveals that the case involves a false conflict. If New Jersey law is applied, no Pennsylvania defendants will be subject to more

liability than their state desires, but if Pennsylvania law applies, New Jersey will lose the opportunity to deter risky activity within its own borders. The Court will therefore apply New Jersey law on the issue of negligence and take-home liability in this case.

As noted above, the New Jersey Supreme Court held that companies working with asbestos "owed a duty to spouses handling the workers' unprotected work clothing based on the foreseeable risk of exposure from asbestos borne home on contaminated clothing." *Olivo*, 895 A.2d at 1149. The question is whether that holding naturally extends to liability on the facts of this case as well. Under New Jersey law, the imposition of a duty is based on foreseeability, and the *Olivo* court held that the defendant company was aware of asbestos dangers and guidelines recommending that workers be allowed to change clothes to avoid carrying asbestos home; therefore, it was foreseeable that spouses handling workers' clothes at home could be exposed to the dangers of asbestos. *See id.* at 1148-49. Plaintiffs here allege Defendants knew or should have known the dangers of beryllium and the appropriateness of measures designed to prevent the carriage of beryllium contamination to workers' homes. At first glance, then, liability in this case does not seem wholly beyond the precedent of *Olivo*.

The *Olivo* opinion does, however, make several more restrictive statements. The court speaks of foreseeability of "harm to a particular individual." *Id.* at 1148. And even when the harm to the particular plaintiff is foreseeable, the imposition of a duty is tempered by "considerations of fairness and policy," *id.* at 1148; those considerations counteract the potential for "limitless exposure to liability," *id.* at 1150. Thus the duty the court ultimately recognized was fairly narrow and tied to the facts of the case, "focused on the particularized foreseeability of harm to the plaintiff's wife, who ordinarily would

8

perform typical household chores that would include laundering the work clothes worn by her husband." *Id.* A restrictive reading of *Olivo* has already been employed in this case, in Judge Jones's orders denying remand (Docket #35 and #47) based on the lack of a colorable claim against prior Defendant Tretter. Because Tretter's connection with Plaintiffs was through Accuratus, and because of the timeline, the only causal routes from Tretter to Brenda are either through Paul, before Brenda was married to or lived with him, or through Altemose, to whom Brenda was of course never married. Judge Jones held that the *Olivo* rule of take-home liability for clothes-handling spouses could not be extended to cover either a non-spouse, non-connubial roommate (Brenda's relation to Altemose) or a non-cohabiting, unmarried romantic partner (Brenda's relation to Paul when he worked at Accuratus).[1]

The Court will not disrupt the sound reasoning that has already been applied in this very case, and the logic that applied to Tretter applies equally to Accuratus itself. While an employer working with beryllium might foresee potential danger to mere roommates and visitors, the considerations of policy and fairness noted by the *Olivo* court demand that take-home liability be reasonably limited. And as far as Plaintiffs' allegations that beryllium in the home may have been stirred back up into the air, causing Brenda's exposure at a later time when the relationships differed, it is unreasonable to hold Accuratus to sharp enough foresight to realize that this particular individual would later marry one of their employees. Therefore, even New Jersey law does not impose a

---

[1] The March 1, 2013, order suggests Brenda and Paul may have cohabited prior to the marriage (and thus potentially during Paul's employment at Accuratus), but the April 5, 2013, order reasserts the lack of duty given that Paul and Brenda were not married until after Paul's employment at Accuratus. Further, the present Amended Complaint specifically alleges that Brenda did not formally move in with Paul and Altemose until after the marriage in June 1980; therefore, Brenda was not even a cohabiting girlfriend until after Paul left Accuratus. In other words, Brenda was never *both* romantically involved with *and* living with an Accuratus employee. Judge Jones's orders and this opinion do not address the specific question of take-home liability for a cohabiting romantic partner that is not technically the employee's spouse.

9

duty on Accuratus regarding harm to Brenda, and the negligence claim against Accuratus is dismissed with prejudice. The negligence claim against Brush survives to the extent it is based on Brenda's exposure to beryllium carried home by Paul during the time they were married and he worked at Brush, as that claim falls directly under *Olivo*.

Strict Products Liability Under §402A

The choice-of-law issues on these claims are not directly briefed. Brush argues Plaintiffs' pleading of Restatement (Second) of Torts §402A means they accept Pennsylvania law because New Jersey has a special products liability statute, but Plaintiffs point out that there is an exception for exposure to toxic chemicals, in which cases New Jersey applies common law. Brush's reply accepts the toxic exposure exception but argues that New Jersey's common law actually differs from Pennsylvania's. There is no further discussion because Brush thinks Pennsylvania applies simply as a result of the way the claim is pled, and Plaintiffs think Pennsylvania and New Jersey are the same.

Pennsylvania employs §402A, see *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 606 (Pa. 1993) (citing *Webb v. Zern*, 220 A.2d 853 (Pa. 1966)),[2] which provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability

---

[2] As discussed more specifically below, the Pennsylvania Supreme Court has addressed the possibility of adopting the Restatement (Third) of Torts, *see Beard v. Johnson & Johnson, Inc.*, 41 A.3d 823, 839 (2012) (Baer, J., concurring), and is currently considering that precise issue, *see Tincher v. Omega Flex, Inc.,* 64 A.3d 626 (Pa. 2013) (granting allocatur).

> for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts §402A (1965). New Jersey employs slightly altered language, having "substituted the phrase 'reasonably fit, suitable and safe' for 'unreasonably dangerous.'" *Brown v. U.S. Stove Co.*, 484 A.2d 1234, 1246 n. 1 (N.J. 1984) (Schreiber, J., concurring). While that difference in standard may make a difference later in this case, the elements at issue at this stage—namely, whether liability attaches only when products have been sold or distributed into the stream of commerce and whether Brenda was and legally needs to be an intended user or consumer—seem to be common to both states' approaches (as well as the Third Restatement). Because no actual conflict presents itself, no further choice-of-law analysis is required.

For liability to arise, the language of §402A suggests the product must have left the defendant—specifically, been sold and moved on to the user or consumer. *See* Restatement (Second) of Torts §402A ("One who sells any product…"; "it is expected to and does reach the user or consumer…"). That is the key holding of *Ettinger v. Triangle-Pacific Corp.*, 799 A.2d 95 (Pa. Super. Ct. 2002). In that case, a cabinet-making company contracted to purchase a large wood-drying oven from another company. *Id.* at 99. Though not directly employed by the oven-selling company, the plaintiff was part of the team retained by that company to install the oven at the cabinet company's plant and was working on that installation when injured. *Id.* The court held that §402A requires a

11

finished "product" and that the oven was not yet a product because the defendant oven-selling company was not complete; liability under §402A cannot attach where the harm was caused by something the defendant was still working on. *Id.* at 102-03. Stated generally, "Section 402A does not apply to an incomplete product that has not left the control of its manufacturer and thus entered the stream of commerce." *Id.* at 105.[3]

Contrary to Plaintiffs' contention, *Donoughe v. Lincoln Electric Co.*, 936 A.2d 52 (Pa. Super. Ct. 2007), does not alter the *Ettinger* analysis with respect to this case. In *Donoughe*, the defendant company manufactured welding rods containing asbestos and sold them to a railroad; the plaintiff worked for the railroad and may have been exposed to asbestos, in part, when he scraped away slag formed by using the welding rods. *Id.* at 57, 67. The court held that §402A liability was proper, because while the slag was not itself the "product" sold by the defendant manufacturer, it was "the expected and inevitable partial metamorphosis of the product that they did manufacture." *Id.* at 67. There was no question that the defendant had completed manufacturing the welding rods and sold them to the railroad, so the relevant aspect of the *Ettinger* ruling was not even implicated in the *Donoughe* analysis.[4]

Applied generally to the present case, *Donoughe* means that when beryllium particulate comes off a material *that has been completed and sold* when that material is being used, even if it is being used by another company in a later manufacturing process, strict liability may attach. But *Ettinger* still means that beryllium particulate that comes

---

[3] Despite some confusion in the briefing, the parties clearly are not arguing about whether Defendants were generally "engaged in the business of selling" the products at issue, a separate §402A requirement. The question is whether Defendants actually completed and turned over or sold any products that harmed Brenda.

[4] The possible applicability of the Third Restatement, addressed below on other issues, would not affect the requirement that a product be completed and put into the stream of commerce, as the Third Restatement still requires that a defendant "sells or distributes a defective product" and defines a defective product based on its status "at the time of sale or distribution." Restatement (Third) of Torts: Prod. Liab. §1, §2.

off a material *during the manufacture of that material before it is completed and sold* will not create strict liability. Although the Amended Complaint does not explain precisely what Brush sold to Accuratus or what processes it went through at Accuratus, there is an allegation that some beryllium products were sold by Brush to Accuratus and that Paul or Altemose may have brought home particulate generated during the use of those beryllium products in some further manufacturing at Accuratus. So the beryllium that reached Brenda could have come from: Brush materials during their manufacture at Brush; Brush products during their use in additional processes at Accuratus; and/or Accuratus materials during their manufacture at Accuratus. So there could be no strict products liability for Accuratus at all, because none of the potential exposure came from any finished and sold Accuratus product. There could be no strict liability for Brush based on exposure during manufacture at Brush, but there could be strict liability for Brush based on exposure to beryllium that came off of finished Brush products that had been sold to Accuratus during their further use at Accuratus.

Even when a product is completed and sold, though, liability under §402A only extends to "the user or consumer." Plaintiffs apparently concede that Brenda does not qualify as a user or consumer, arguing instead that the Court should apply the Third Restatement, which thoroughly reformulates the strict products liability standard and more flexibly imposes liability for "foreseeable risks of harm." Restatement (Third) of Torts: Prod. Liab. §2 (1998).[5] Third Circuit precedent has predicted that the Pennsylvania Supreme Court would adopt the Third Restatement. *See Berrier v. Simplicity Mfg., Inc.*,

---

[5] It is because strict liability has its own standard for who is a proper plaintiff (either user or consumer under the Second Restatement or a broader foreseeability assessment under the Third Restatement) that the Court declines to import the spouse-only rule from the negligence analysis above into the strict liability analysis. Limiting to spouses would of course mean no strict liability at all for either defendant, as the only potential strict liability exposure occurred at Accuratus, where there is no spousal connection.

563 F.3d 38, 53-61 (3d Cir. 2009), *cert. denied*, *Simplicity Mfg., Inc v. Berrier*, 558 U.S. 1011, 130 S. Ct. 553, 175 L. Ed. 2d 383 (2009); *Covell v. Bell Sports, Inc.*, 651 F.3d 357, 360-64 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1541, 182 L. Ed. 2d 162 (2012). But some Pennsylvania cases leave that conclusion open to debate, *see Beard v. Johnson & Johnson, Inc.*, 41 A.3d 823, 839 (Pa. 2012); *Lance v. Wyeth*, 4 A.3d 160, 169 (Pa. Super. Ct. 2010), and not all District Courts in the Third Circuit have applied the Third Restatement, *see Sweitzer v. Oxmaster, Inc.*, CIV.A. 09-5606, 2010 WL 5257226 (E.D. Pa. Dec. 23, 2010). The Pennsylvania Supreme Court has recently granted allocatur and heard argument on precisely this issue, including retroactivity. *See Tincher v. Omega Flex, Inc.,* 64 A.3d 626 (Pa. 2013). Because the Third Circuit's direction to apply the Third Restatement would likely cause this claim to survive the motion to dismiss (Defendants have not briefed the issue of whether the claim is viable under the Third Restatement, and discovery might be necessary to assess foreseeability), and because guidance on this issue will likely come from the Pennsylvania Supreme Court before the conclusion of this suit, the Court will not dismiss on the basis of the "user or consumer" requirement at this point.[6]

Whether the products at issue underwent substantial change need not be addressed in detail at this stage, as that is a factual question for the jury or possibly summary judgment. *See Rooney v. Fed. Press Co.*, 751 F.2d 140, 144 (3d Cir. 1984) ("Under Pennsylvania law, only unforeseeable modifications in a product will insulate its manufacturer from strict products liability, and the question whether such a substantial change has been made is a factual issue to be determined by a jury."); *Merriweather v. E.*

---

[6] Defendants also argue that the claim must be analyzed under §402A because it is pled under that section in the Amended Complaint. If the Court were concerned with that technicality, it would allow Plaintiffs to amend accordingly.

14

*W. Bliss Co.*, 636 F.2d 42, 46 (3d Cir. 1980). The Amended Complaint does allege there was no substantial change, so resolution of that factual question on the motion to dismiss would be inappropriate.

In sum, the above analysis dictates that the strict products liability claim against Accuratus be dismissed with prejudice. The strict products liability claim against Brush will not be dismissed, though as explained, it will at most cover harm derived from beryllium products that Brush completed and sold to Accuratus. Brush may raise arguments about substantial change or the user or consumer or foreseeability arguments again at a later stage.

<u>Strict Liability for Abnormally Dangerous or Ultrahazardous Activity</u>

First, the separate claims for abnormally dangerous activity and ultrahazardous activity are indeed duplicative. Plaintiffs may plead in the alternative, which is why the Court is not persuaded by Defendants' argument that the allegations of negligence and lack of due care preclude claims for abnormally dangerous activity based on the futility of due care.[7] But the abnormally dangerous and ultrahazardous activity claims do not state any alternative theories or facts; they are essentially identical in all but name. Plaintiffs admit the terms are interchangeable. The Court will therefore dismiss the ultrahazardous activity counts, as abnormally dangerous is the more modern terminology and the abnormally dangerous counts of the Amended Complaint include the full standard and reference the relevant restatement sections.

---

[7] Brush cites *Hirsch v. CSX Transp., Inc.*, No. 1:07-cv-3512 (N.D. Ohio Oct. 22, 2008), which dismissed an abnormally dangerous activity claim in part because it was incompatible with allegations of negligence. But that case is not precedential here, and it is not persuasive. It mistakenly treats the §520(c) factors as necessary elements and requires the complaint to allege facts satisfying each one.

No choice-of-law analysis is required with respect to the abnormally dangerous activity issue, because both Pennsylvania and New Jersey use Restatement (Second) of Torts §§ 519 and 520. *See United States v. Union Corp.*, 277 F. Supp. 2d 478, 493 (E.D. Pa. 2003); *T & E Indus., Inc. v. Safety Light Corp.*, 587 A.2d 1249, 1259 (N.J. 1991).

The law imposes liability even where a defendant "has exercised the utmost care" if the defendant "carries on an abnormally dangerous activity." Restatement (Second) of Torts §519 (1977). Several factors help courts determine whether an activity is abnormally dangerous:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520. The doctrine has traditionally been applied to a narrow set of activities, specifically blasting and the keeping of wild animals. *See Roth v. NorFalco, LLC*, CIVA 1:06-CV-01452, 2010 WL 1754618 (M.D. Pa. Apr. 29, 2010) (citing *Albig v. Mun. Auth. of Westmoreland Cnty.*, 502 A.2d 658, 662 (1985)), *aff'd*, 651 F.3d 367 (3d Cir. 2011).

But none of the cases Brush cites support a categorical rule that the doctrine must be limited to blasting or that it cannot apply to something like the manufacture of

16

beryllium products. In *Villari v. Terminix International, Inc.*, 663 F. Supp. 727, 728-29, 731-32 (E.D. Pa. 1987), the plaintiff homeowners were harmed by pesticides the defendant spilled while treating their home, and the court found there was no abnormally dangerous activity. But that case was decided based on the fact that the homeowners requested and contracted for the pesticide treatment for their own benefit; that relationship made the abnormally dangerous activity analysis simply inapplicable. *Id.* at 731-32. *United States v. Union Corp.* merely holds that abnormal dangerousness liability does not apply to a manufacturer of a product when a separate downstream party engages in abnormally dangerous activity involving the product. 277 F. Supp. 2d at 493-95; *see also City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 615 (7th Cir. 1989) (holding that strict liability for abnormally dangerous activity applies only to the party actually engaged in the dangerous activity). Plaintiffs in the present case allege that the Defendants' manufacturing processes were in and of themselves abnormally dangerous activities.

Further, while the cases in Brush's lengthy footnote find that various activities involving toxic materials do not constitute abnormally dangerous activities, most of them do so on the basis of weighing the §520 factors as applied in the particular cases, especially §520(c).[8] *See, e.g.*, *Arlington Forest Assocs. v. Exxon Corp.*, 774 F. Supp. 387, 390 (E.D. Va. 1991) (decided on summary judgment); *Greene v. Prod. Mfg. Corp.*, 842 F. Supp. 1321, 1326-27 (D. Kan. 1993) (also deciding summary judgment). The cases are also somewhat unpersuasive simply because if the §520 standard is indeed as high a

---

[8] A few of these citations are inapplicable to this case for other reasons. *See, e.g.*, *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609, 623 (M.D. Pa. 1997) (finding abnormal dangerousness liability does not extend to *former* landowners*); Whitfield v. Tonox Worldwide LLC*, 1:03CV287-D-D, 2007 WL 1561807 (N.D. Miss. May 25, 2007) (finding that *Mississippi* precedent does strictly limit such liability to "cases involving the use and transport of explosives in populated areas").

17

threshold as these cases suggest, it is hard to imagine even blasting would qualify if it did not have the weight of history already behind it.

In any event, an assessment of the factors requires development of the facts, even though it is an issue for the court to decide: "Whether the activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors listed in this Section, and the weight given to each that it merits *upon the facts in evidence*." Restatement (Second) of Torts § 520 cmt. l (emphasis added). Further, Plaintiffs' citations demonstrate that there are at least some cases finding activities involving toxic substances to be abnormally dangerous, which undermines a categorical rule to the contrary. *See, e.g.*, *Banks v. Ashland Oil Co.*, 127 F. Supp. 2d 679, 680-81 (E.D. Pa. 2001) (denying a motion to dismiss an abnormally dangerous activity claim where defendant allegedly discharged hazardous vapors from a chemical plant, notably because "the court lack[ed] a sufficiently developed record to evaluate" the §520 factors).

Development of the factual record is necessary in this case to assess the §520 factors. While it is apparent that the harm that may occur is very serious, it is not sufficiently clear how likely that harm is, how common and valuable to society the manufacture of beryllium products is, and of course whether reasonable care could eliminate the risks. These issues and others (such as the appropriate way of defining the "activity" at issue, i.e., "manufacturing beryllium products" or "manufacturing beryllium products without particular safeguards"), may yet rule out a finding of abnormally dangerous activity in this case, but the claims should not be precluded at this juncture.

Finally, there appears to be no difference between Brush and Accuratus with regard to the abnormally dangerous activity claim at this stage. Liability falls on "[o]ne

18

who carries on an abnormally dangerous activity" for harm that results from the activity; there are no issues of relationship, completed products, or stream of commerce. Restatement (Second) of Torts §519. It is possible that the two Defendants will differ with respect to whether their activities meet the test for abnormal dangerousness, because of differences in their activities, locations, and so forth, but those will also be matters for determination after development of the factual record.

Conclusion

Because New Jersey law applies to the negligence claims, but a duty nevertheless cannot extend to Brenda either via Paul prior to the marriage or via Altemose, Count I (negligence against Accuratus) is dismissed with prejudice, and Count V (negligence against Brush) is not dismissed. Because strict products liability requires a completed and sold product, Count IV (strict products liability against Accuratus) is dismissed with prejudice. Count VIII (strict products liability against Brush) is not dismissed, though its scope is limited and forthcoming guidance from the Pennsylvania Supreme Court may affect its viability. Because the claims for strict liability for ultrahazardous activity are interchangeable with and add nothing to the claims for abnormally dangerous activity, Counts III (ultrahazardous activity against Accuratus) and VII (ultrahazardous activity against Brush) are dismissed with prejudice. Finally, because more facts are necessary to determine whether Defendants' acitivities were abnormally dangerous, Counts II (abnormally dangerous activity against Accuratus) and VI (abnormally dangerous activity against Brush) are not dismissed. Counts IX (exemplary damages) and X (loss of consortium) are not challenged except in that they depend upon the other claims; they are

therefore not dismissed and may proceed to the extent they derive from the other surviving claims.