

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRENDA ANN SCHWARTZ and PAUL GRANT
SCHWARTZ,

Plaintiffs,

v.

ACCURATUS CORPORATION,
in its own right and as successor in interest to
Accuratus Ceramic Corporation,

Defendant.

CIVIL ACTION
NO. 12-6189

FILED
FEB 2 1 2018
KATE BARKMAN, Clerk
Dep. Clerk

**MEMORANDUM**

SCHMEHL, J.                                                    FEBRUARY 21, 2018

This case is a negligence action brought by Plaintiff Brenda Schwartz ("Mrs. Schwartz")

and her husband Paul Schwartz ("Mr. Schwartz") against Defendant Accuratus Corporation, a

manufacturer of beryllium-containing products. Plaintiffs bring these claims against Defendant

Accuratus for harm they claim is the result of exposure to beryllium carried home from work on

shoes and clothing by Mr. Schwartz and a third person who was their roommate. Mr. Schwartz

and the roommate worked at Accuratus and came in contact with beryllium products on a daily

basis. Mrs. Schwartz now suffers from chronic beryllium disease ("CBD"), an irreversible

granulomatous disease of the lungs which can only be caused by exposure to beryllium. For

reasons explained below, this Court will deny Defendant's motion for summary judgment

## I.    **UNDISPUTED FACTS**

As this Court pointed out in a prior opinion, this matter has a complicated history. The

primary Plaintiff is Brenda Ann Schwartz ("Mrs. Schwartz"), who suffers from a variety of

adverse health effects associated with chronic beryllium disease ("CBD"). Both Plaintiffs, Mr.

and Mrs. Schwartz, are Pennsylvania residents. Defendant Accuratus Corporation ("Accuratus") occupies a plant in New Jersey and manufactures beryllium products.

Chronic beryllium disease results from exposure to beryllium in a dust form. Without undue focus on the technical aspects in this section, the factual and legal situation can be considered analogous to the more familiar issue of asbestos exposure. As with asbestos, exposure to beryllium can result from employment in facilities working with the dangerous toxin. However, Mrs. Schwartz never worked at Accuratus (or Materion Brush, formerly Brush Wellman). Mrs. Schwartz alleges her exposure to beryllium is a product of Mr. Schwartz and their roommate, Gregory Altemose, carrying home the insidious toxin from work via their clothing and/or shoes.

Mr. and Mrs. Schwartz met and began dating in 1978 while Mr. Schwartz worked for Accuratus. Mr. Schwartz moved in with Mr. Altemose in 1979, and Mrs. Schwartz spent a lot of time at their apartment on Grant Street. In June 1980, Mr. and Mrs. Schwartz married and moved into the Grant Street apartment, where all three lived together for a time. In 1978 and 1979—that is, when Mrs. Schwartz merely dated Mr. Schwartz and visited the apartment—Mr. Schwartz worked at Accuratus. Mr. Altemose also started working at Accuratus in 1978, but continued working there long after Mr. Schwartz left. Following his employment at Accuratus, Mr. Schwartz worked at Materion Brush from 1979 through 1987. During this time, Materion Brush sold beryllium products to Accuratus, which may then have been used in further manufacturing processes at Accuratus.

Following Mrs. Schwartz's diagnosis of CBD in August 2012, Plaintiffs filed claims for negligence, loss of consortium, and exemplary damages, among others. Plaintiffs originally filed suit in state court. The suit named an additional Defendant, Dennis Tretter, a Pennsylvania

citizen who worked for Accuratus enforcing safety policies. On November 1, 2012, Defendants removed the action to this Court, arguing that Tretter was fraudulently joined to defeat diversity jurisdiction. Plaintiffs filed a motion to remand dealing with that issue, which Judge C. Darnell Jones denied on March 1, 2013. Judge Jones's order (as well as a subsequent order denying reconsideration on April 5, 2013) examined Tretter's potential liability in a lengthy footnote and, finding none, ruled Tretter's joinder was unfounded and concluded jurisdiction in this Court on the basis of diversity was proper.

Plaintiffs filed an amended complaint and both Accuratus and Materion Brush moved to dismiss. This Court granted dismissal on several counts. After this Court declined to certify its dismissal of the negligence claim against Accuratus for interlocutory appeal, Plaintiffs settled and voluntarily dismissed with prejudice all claims against Materion Brush; Plaintiffs also voluntarily dismissed with prejudice the remaining claim against Accuratus – terminating the case and allowing Plaintiffs to appeal this Court's dismissal of the negligence claim against Accuratus.

As more fully explained in the discussion below, our Circuit certified the question of take-home liability to spouses of employees who carry home dangerous substances for further clarification. While the New Jersey Supreme Court's response did not draw any specific conclusions about this particular case, it clarified that there should be no bright line rule limiting the duty to spouses and provided specific factors to determine whether there is a duty based on the circumstances of each take-home exposure case. Our Circuit then vacated this Court's dismissal of the negligence claim against Accuratus and remanded for further consideration in accordance with its own ruling and the New Jersey Supreme Court's guidance.

3

Following supplemental briefing and oral argument on the matter, this Court denied the motion to dismiss and allowed the negligence claim against Defendant Accuratus to proceed. This Court concluded: "it may be reasonably foreseeable to a Defendant employer working with a particularly insidious toxic substance that material carried home on an employee's clothes may harm someone at that home who is a frequent overnight guest and romantic partner or a roommate sharing living space and housework." This Court ordered discovery continue and earnest settlement discussions be held, and now considers the motion for summary judgment with respect to the negligence claims against Accuratus.

## II. ANALYSIS

### 1. Choice of Law

As this Court announced in its March 24, 2014 Opinion, we applied New Jersey law on the issue of negligence and take-home liability in this case. Sitting in Pennsylvania, with jurisdiction by way of diversity, we applied Pennsylvania's choice-of-law rules. *See Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012). Under Pennsylvania choice-of-law, the court first asks whether there is an actual conflict between the laws of the states involved; if not, no analysis is necessary and the states' laws are interchangeable. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229-30 (3d Cir. 2007). If there is a conflict, the court asks whether it is a true or false conflict or an unprovided-for situation. *Id.* at 230. If it is a true conflict, the court asks which state has the greater contacts and interest in seeing its law applied. *Id.* at 230-31. In unprovided-for situations, where neither state has an interest, traditional choice-of-law rules based on the type of action apply. *Id.* at 230 n. 9. If it is a false conflict, meaning "only one jurisdiction's governmental interests would be impaired by

4

the application of the other jurisdiction's laws," the law of the state with an interest applies. *Id.* at 229-30 (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991)).

This Court determined New Jersey's conduct-deterring rule juxtaposed with Pennsylvania's silent defendant-protecting rule revealed the case involved a false conflict. We concluded: "if New Jersey law is applied, no Pennsylvania defendants will be subject to more liability than their state desires, but if Pennsylvania law applies, New Jersey will lose the opportunity to deter risky activity within its own borders." (ECF Docket No. 65, at 7-8.) Accordingly, we applied New Jersey law on the issue of negligence and take-home liability and will continue to apply New Jersey law in our analysis.

### 2. *Olivo* and *Accuratus* cases in the New Jersey Supreme Court

New Jersey allows for take-home liability in the asbestos context.[1] Specifically, companies working with asbestos "owed a duty to spouses handling the workers' unprotected work clothing based on the foreseeable risk of exposure from asbestos borne home on contaminated clothing." *Olivo v. Owens-Illinois, Inc.*, 895 A.2d 1143, 1149 (N.J. 2006). Under New Jersey law, the imposition of a duty is based on foreseeability, and the court in *Olivo* concluded the defendant company had been aware of the asbestos dangers and the guidelines recommending workers change clothes to avoid carrying asbestos home; therefore, it was foreseeable for spouses handling workers' clothes at home to be exposed to the dangers of asbestos. *Id.* at 1148-49.

---

[1] Pennsylvania has no case affirmatively providing for take-home liability, but the cases specifically denying the existence of such a duty under Pennsylvania law are not opinions from Pennsylvania's own courts. *See In re Asbestos Litig.*, CIV.A. N10C-04203ASB, 2012 WL 1413887 (Del. Super. Ct. Feb. 21, 2012) (concluding, largely because of the tenuous relationship between an employer and an employee's spouse, that "under Pennsylvania law an employer/premises owner does not owe a duty to the spouse of an employee in the take home asbestos exposure context"); *Jesensky v. A-Best Products Co.*, No. 96-680 (W.D. Pa. Oct. 29, 2003) (finding, in an asbestos take-home case, that there was no Pennsylvania precedent for extending a duty based on premises liability to someone who had never been on the property), *report and recommendation adopted in part and rejected in part by* CIV.A. 96-680, 2004 WL 5267498 (W.D. Pa. Feb. 17, 2004), *aff'd sub nom.*, *Jesensky v. A-Best Products*, 287 F. App'x 968 (3d Cir. 2008).

However, *Olivo* made limiting statements which impact foreseeability in take-home liability cases. As we noted in our March 24, 2014 Opinion:

> [t]he court speaks of foreseeability of 'harm to a particular individual.' And even when the harm to the particular plaintiff is foreseeable, the imposition of a duty is tempered by 'considerations of fairness and policy'; those considerations counteract the potential for 'limitless exposure to liability.' Thus the duty the court ultimately recognized was fairly narrow and tied to the facts of the case, 'focused on the particularized foreseeability of harm to the plaintiff's wife, who ordinarily would perform typical household chores that would include laundering the work clothes worn by her husband.'

(ECF Docket No. 65, at 8-9, citing *Olivo*, 895 A.2d at 1148-1150.) The New Jersey Supreme Court concluded that companies working with asbestos "owed a duty to spouses handling the workers' unprotected work clothing based on the foreseeable risk of exposure from asbestos borne home on contaminated clothing." *Olivo*, 895 A.2d at 1149. Following *Olivo*, we concluded New Jersey's take-home liability reasonably limited liability and did not extend past spouses.

Following our decision declining to extend a duty of care to Mrs. Schwartz either via Mr. Schwartz (her husband) prior to marriage, or via Mr. Altemose (their roommate), our Circuit certified to the New Jersey Supreme Court the following question: "Does the premises liability rule set forth in *Olivo v. Owens-Illinois*, 895 A.2d 1143 (N.J. 2006), extend beyond providing a duty of care to the spouse of a person exposed to toxic substances on the landowner's premises, and, if so, what are the limits on that liability rule and the associated scope of duty?" In deciding, the New Jersey Supreme Court embraced courts' "stewardship of the common law" and flexibility in developing rules on a fact-sensitive, case-by-case basis. *Schwartz v. Accuratus Corp.*, 139 A.3d 84, 90 (N.J. 2016). Supporting this approach, the court concluded *Olivo* did not

6

establish a hard and fast spousal limit on take-home exposure duty.[2] As we noted in our March 30, 2017 Opinion, the New Jersey Supreme Court declined to give particular answers for this case, concluding that "a refined analysis for a particularized risk, foreseeability, and fairness requires a case-by-case assessment in toxic tort settings." *Id.* at 92. A more thorough analysis of these cases will continue below.

   3. Take-home liability of Accuratus

   a. A genuine issue of material fact exists regarding Accuratus' take-home liability and Mrs. Schwartz's foreseeability as a plaintiff.

The New Jersey Supreme Court in *Olivo* "focused on the particularized foreseeability of harm to the plaintiff's wife, who ordinarily would perform typical household chores that would include laundering the work clothes worn by her husband." *Olivo*, 895 A.2d at 1150. This Court narrowly interpreted the *Olivo* decision and declined to impose take-home liability on Defendant Accuratus. Influenced by Judge C. Darnell Jones' dismissal of the claims against a safety supervisor at Accuratus who was "never linked to Mrs. Schwartz through a spousal relationship or even romantic co-habitation," this Court refused to impose take-home liability on Accuratus for Mrs. Schwartz's illness. (ECF Docket No. 97, at 5.) However, following the New Jersey Supreme Court's guidance in *Schwartz v Accuratus Corp.*, 139 A.3d 84, 90 (N.J. 2016), this Court reevaluated the case with regards to take-home liability and found that the nature of the toxic substance and the relationships in this case could be sufficient to generate a duty.

---

[2] "*Olivo* does not suggest that the duty recognized must remain static for all future cases—no matter the pleadings and proofs, including unknown aspects of other toxins—and that take-home toxic-tort liability must remain limited to a spouse handling take-home toxins. That simply was an essential fact of the case on which we were called on to act, as a court of common law, and determine whether, in the development of our common law, a foreseeable duty could be recognized on the facts presented. We held that it could. However, *Olivo* does not state, explicitly or implicitly, that a duty of care for take-home toxic-tort liability cannot extend beyond a spouse. Nor does it base liability on some definition of 'household' member, or even on the basis of biological or familial relationships." *Schwartz v. Accuratus Corp.*, 139 A.3d 84, 90-91 (N.J. 2016).

The court in *Accuratus* concluded that the *Olivo* holding did not establish a hard and fast spousal limit on take-home liability. *Id.* at 90-91. While the court refused to impose a categorical limit on whether take-home toxic-tort liability could extend beyond a spouse, it warned against extending liability beyond its intended purpose: "note that no precedent from another jurisdiction, in a non-strict liability setting, has found a duty in a take-home toxic-tort cause of action outside of a factual setting involving household members, presumably because of the idiosyncratic nature of most other interactions with a take-home toxin." *Id.* at 91. However, the court declined to provide particular answers for our case, stating "a refined analysis for particularized risk, foreseeability, and fairness require a case-by-case assessment in toxic-tort settings." *Id.* at 92. While espousing the importance of "foreseeability," the court noted that "consideration of fairness and policy also inform the analysis as to whether a duty of care exists." *Id.* (quotation omitted).

The court provided several important factors which guide our foreseeability analysis: 1) the relationship of the parties; 2) the opportunity for exposure and the nature of the exposure to the dangerous substance that causes the risk of injury; and 3) the employer's knowledge of the dangerousness of the exposure, assessed at the time when the exposure to the individual occurred and not later, when greater information may become available." *Id.* at 91-92. Analyzing the "relationship of the parties" requires an assessment not only of the "relationship between a defendant's employee and the person who is exposed to the take-home toxin, but also the relationship between the defendant itself and the injured person, in determining whether it would be foreseeable [or] predictable" that a defendant would owe a duty of care to that person or class of individuals. *Id.* at 91-92. "To that end, idiosyncratic encounters would be difficult to ever predict, even when occurring within the home of the person on whom the toxin is transported."

*Id.* Further, identifying a foreseeable duty by a landowner for off-premises exposure of dangerous toxins requires examination of the "dangerousness of the toxin, how it causes injury, and the reasonable precautions [taken] to protect against a particular toxin." *Id.* The above factors concern the nature of the particular toxin's dangerousness (beryllium) and the defendant's awareness thereof as well as the available safety procedures. We will follow our March 30, 2017 Opinion and first address the second and third factors, then conclude with the relationship between the parties.

i. *Opportunity for exposure and nature of exposure to the dangerous substance*

Plaintiffs present expert testimony from Adam Finkel, an industrial hygiene expert, and Dr. Milton Rossman, Mrs. Schwartz's treating pulmonologist. (ECF Docket No. 133, at 19.) Plaintiffs also provide this Court with literature detailing the harmful effects of beryllium exposure. (Id.) Plaintiffs argue that beryllium is a particularly insidious toxic substance that can easily spread around and beyond the facility where it originates and is known to travel on clothes to workers' homes. Plaintiffs maintain, and we recognized in our previous Opinion, "[t]he negative consequences that may follow beryllium exposure are quite severe, including lung disease, dermatologic disease, cancer, or chronic beryllium disease (CBD), which may involve lung scarring, cough, fatigue, progressive shortness of breath, and problems with other organs, among other symptoms." (ECF Docket No. 97, at 8).

Mr. Finkel provides facts about beryllium and CBD relating to the nature of exposure and its dangerousness. (ECF Docket No. 133, at 20.) For example: "CBD is a disease caused 'exclusively and definitively by inhalation of beryllium particles'" (Id); "Someone exposed to beryllium only for a brief and long-ago window in time can go on to develop CBD long after additional exposure ended" (Id.); "Over a period of several months, a cohabitant [of an employee

bringing beryllium home on their clothes and shoes] could inhale more than enough beryllium to exceed cumulative amounts already known to have caused CBD in workers" (Id.); "Beryllium dust can settle onto carpets and other surfaces, and be resuspended in the air when the home is vacuumed." (Id.); and "It is not unusual for decades to elapse between first exposure to beryllium and a diagnosis of CBD." (Id.)

Mrs. Schwartz's treating pulmonologist, Dr. Milton Rossman, provides that Mrs. Schwartz suffers from CBD as a result of her exposure to beryllium through the contaminated work clothes of her then boyfriend, Paul Schwartz, and their longtime roommate, Gregory Altemose. Specifically, Dr. Rossman finds "Mrs. Schwartz's lung damage was present for some time; that her latency period was approximately 30 years; and that 'there have been some cases [of CBD] that were not diagnosed until over 40 years after first exposure." (Id. at 21.)

### ii. *Accuratus' knowledge of the dangerousness of exposure*

Whether beryllium is in fact an insidious toxic substance causing harm to those that come in contact with the toxin is not disputed; however, this Court must determine Accuratus' awareness of this danger (assessed at the time of the exposure) and the availability of safety procedures. Plaintiffs provide evidence obtained through discovery that Accuratus was aware of the "take-home" risks associated with beryllium at the time Mr. Schwartz worked for Accuratus. (ECF Docket No. 133, at 21). According to Dennis Tretter, the Accuratus safety manager at the time of Mr. Schwartz's employment, the "take-home" risks associated with beryllium were known and Materion Brush (formerly Brush Wellman), Accuratus' beryllium supplier, had implemented procedures to protect against risks of take-home exposure. (Id. at 133.) Prior to his employment at Accuratus, Mr. Tretter worked at Brush Wellman in the 1970s and testified that Brush Wellman made him "acquainted with the health risks and hazards associated with

beryllium." (ECF Docket No. 133, Exhibit M at 29:21-5.)  Moreover, Mr. Tretter testified that Brush Wellman required machinists to put on specific work clothing before operating the machines, take them off at the end of the day and leave them in the facility to be laundered to use the next day.  (Id., Exhibit M at 39:3-20.)  Specifically, Brush Wellman employed a "strict protocol around keeping the dirty work clothes away from street clothes that [employees] would come in [with]" and provided showers for employees. (Id., Exhibit M at 39:21-23.)

Plaintiffs also present this Court with an affidavit from Marc Kolanz, the Vice President of Environmental Health and Safety at Materion Brush.  In the affidavit, Mr. Kolanz states Brush "made Accuratus aware of the dangers of take-home beryllium and the need for a change clothes policy to protect workers from bringing home beryllium as early as 1965, more than a decade before Mr. Schwartz began working at Accuratus."  (Id. at 22, Exhibit D (part 1), ¶ 2.) According to Plaintiffs, "Mr. Kolanz further noted that in 1978 Brush provided a letter to Accuratus, warning the company about the 'serious, chronic pulmonary illness' that is caused by beryllium."  Further, in 1985 Brush Wellman sent all of its customers, including Accuratus, a letter informing them of the new OSHA Hazard Communications Standards and enclosed a Material Safety Data Sheet which advised that "[a]ll contaminated clothing should be placed in a sealed container and sent to special laundry facilities." (Id., Exhibit D (part 1), ¶4.)

Plaintiffs contend Accuratus failed to adhere to standards pronounced by OSHA despite its actual knowledge of the risks of take-home exposure.  Mr. Finkel details Accuratus' "inadequacy of its general industrial hygiene program, and of its clothing and decontamination programs in particular."  (Id. at 22.)  In the year before Mr. Schwartz began working at Accuratus, the United States Department of Labor created a fact sheet stating "[a]nyone exposed to beryllium should change into street clothes before going home . . . Work clothing should be

vacuumed before removal and then stored in dust-proof containers until laundering . . . There should be separate lockers for work and street clothes, and showers should be provided so that workers can bathe before changing into street clothes." (Id. at 22, Exhibit C, ¶ 34.) By 1977, the year Accuratus began operations, industry standards already focused on safety protocols and proper handling of clothing post-beryllium exposure. "[M]any of [Accuratus'] colleagues, suppliers, and competitors in the various industries who used or handled beryllium had already taken many steps to keep beryllium dust from leaving the premises on the clothes, hair, or skin of workers." (Id. at 23, Exhibit C, ¶ 41.) Based on the evidence offered through discovery, Accuratus may have been aware of the dangerousness of the toxic substance and the necessary response to its danger.

Accuratus urges this Court to evaluate the public interest and consider factors of fairness and public policy when deciding to expand a premises owner's duty of care. (ECF Docket No. 123-1, at 17-18.) Accuratus contends that expanding take-home liability would subject employers in New Jersey "to tort actions brought by an expansive, practically limitless pool of remotely exposed persons . . . [and] such an expansive duty would also have a severe adverse financial effect on employers." (Id. at 20.) Accuratus ostensibly focuses most of its attention on the relationship between its employee, Mr. Schwartz, and his then girlfriend, Brenda Ann Schwartz. Moreover, Accuratus argues our foreseeability analysis should be conducted at the time of the subject act/omissions – the late 1970s – and not based on the domestic norms of 2017.

As we noted above and in our prior Opinions, the negative consequences that may follow beryllium exposure are quite severe and it appears Accuratus had at least some knowledge of the danger. Further, preventative measures, at the very least a clothes-changing protocol seem to be

obvious and relatively simple, "because prior Brush Wellman employed such a procedure while Accuratus did not." (ECF Docket No. 97, at 8.) As this Court determined, "if Defendant knew just a brief exposure could cause harm, this is not a case where the law should insist upon the closest, longest, most serious relationship" – discussed at length below. (Id. at 10.)

### iii. Relationship of the parties

Summary judgment requires that all necessary factual issues are settled and no triable issues of fact remain. Here, the relationship between Accuratus, Mr. Paul Schwartz, and Mrs. Brenda Schwartz is dispositive of Accuratus' legal duty to Mrs. Schwartz. Our previous opinion concluded that "it may be reasonably foreseeable to a Defendant employer working with a particularly insidious toxic substance that material carried home on an employee's clothes may harm someone at that home who is a frequent overnight guest and romantic partner or a roommate sharing living space and housework." (ECF Docket No. 97, at 11.) Following the New Jersey Supreme Court's review of this case, this Court declined to grant Accuratus dismissal and deferred until Summary Judgment. While Accuratus recognizes the decision by the New Jersey Supreme Court extends liability outside the spousal relationship, Accuratus argues issues of foreseeability, fairness, and predictability must weigh in our determination of the scope of any such duty. (Id. at 18.)

First, we must address the relationship between Accuratus and Mrs. Schwartz. Following our previous decision, there appeared to be no particular direct relationship between Mrs. Schwartz and Accuratus. *Schwartz*, 139 A.3d at 91 ("That would include an assessment not only of the relationship between a defendant's employee and the person who is exposed to the take-home toxin, but also the relationship between the defendant itself and the injured person . . ."). Continuing, we stated:

> In some cases a defendant employer/landowner might have some
> particular relationship with or knowledge of the injured party, such as
> perhaps inclusion on the employee's insurance policy or familiarity from
> company social functions, but the absence of a direct relationship does not
> seem to count much against duty and liability. As a simple fact of human
> life, an employer must reasonably foresee that virtually all of its
> employees live with or have repeated close contact with someone, unless
> there is good reason to believe that its employees are disproportionately
> hermits and loners.

(ECF Docket No. 97, at 9-10.) While no direct relationship between Accuratus and Mrs. Schwartz exists, Accuratus should have been aware of the dangers of beryllium and the risk of exposure to a random stranger or occasional visitor to the home of an employee.

The record developed through discovery provides this Court with evidence of Mr. and Mrs. Schwartz's relationship prior to their marriage while Mr. Schwartz worked at Accuratus. It appears Mrs. Schwartz and Mr. Schwartz began dating in the Summer or Fall of 1978 while Mr. Schwartz lived with Mr. Altemose and worked at Accuratus. While Mrs. Schwartz never had the legal relationship of marriage with an Accuratus employee during the initial contamination, given the toxin's danger with minimal exposure and the potential for resuspension into the air – discussed above – the duty-creating relationship threshold in this case must be considered relatively low. (ECF Docket No. 97, at 8.) Therefore, it is possible this court may find a duty in the absence of a spousal relationship between Paul Schwartz and Brenda Schwartz.

Mrs. Schwartz represents to this Court that while both Paul Schwartz, her then boyfriend, and Gregory Altemose, her longtime roommate, were employed with Accuratus, their relationship was the essence of "predictable, regular, and close." (ECF Docket No. 133, at 23.) The eventual Schwartzes dated for a period of some months while Mr. Schwartz was employed by Accuratus, with Mrs. Schwartz frequently visiting his apartment – where Mr. Altemose also resided. (Id. at 24.) While much of our discussion has focused on whether Mrs. Schwartz was

an "overnight guest" and the number of times she stayed overnight, this should not be the Court's sole focus.

It appears Mr. and Mrs. Schwartz's relationship had been more intimate than asserted in the Complaint. Specifically, Mrs. Schwartz testified she came into direct contact with Mr. Schwartz's work clothes because Mr. Schwartz would pick up Mrs. Schwartz after work and bring her to his apartment – without having first changed his work clothes. (Id., Exhibit E, 27:12-18.) Prior to changing out of his work clothes, Mr. and Mrs. Schwartz would go into his bedroom while Mr. Schwartz undressed, and the two would become physically intimate. (Id., Exhibit E, 29:16-30:10.) Mrs. Schwartz ostensibly visited Mr. Schwartz many times and even engaged in intimate conduct with Mr. Schwartz directly after work; however, both parties dispute her status as an "overnight guest." Although Mrs. Schwartz claims to have only stayed over "several times," she would not leave the apartment until the early morning hours – typically 2:00 or 3:00 a.m. (Id., Exhibit E, 26:3-27,58:1-10.) While we decline to impose a categorical line, it appears Mrs. Schwartz's visits to the Grant Street apartment contributed to her exposure to beryllium.

Along with the evidence put forth regarding her visitation to the Grant Street apartment, Mrs. Schwartz provides evidence of her status in the apartment: she picked up after Mr. Altemose, handled his work clothes several times, and washed both Mr. Schwartz's and Mr. Altemose's towels at least once a week. (Id., Exhibit E, 32:20-34:16.) Mrs. Schwartz and Mr. Altemose also spent time together in the Grant Street apartment. (Id., Exhibit E, 34:21-35:13.) "Well, it varied the time that we were living together. Sometimes we would talk in the living room, sit on the sofas and stuff and he came in with his clothes on. Maybe approximately an

hour sometimes. It depended on what was going on." (Id.) Mrs. Schwartz also testified that she regularly cleaned the common areas of the apartment, which they shared with Mr. Altemose.

Following their marriage in 1980, Plaintiffs continued to reside in the upstairs portion of the Grant Street apartment with Mr. Altemose and continued to share a bathroom, living room, and kitchen. (ECF Docket No. 133-1, ¶ 8; ECF Docket No. 133, Exhibit E, 51:3-21; ECF Docket No. 133, Exhibit O, 42:15.) Two years later, Plaintiffs and Mr. Altemose moved to a downstairs unit. Mr. Altemose had his own entrance to the downstairs apartment and his bedroom which included a half-bath. (ECF Docket No. 133-1, ¶ 9.) However, according to Plaintiffs, "the parties did continue to share a common living room, kitchen, and laundry room" in the downstairs apartment. (Id.; ECF Docket No. 133, Exhibit E, 51:3-52:12.) According to Mr. Schwartz's testimony, the parties lived in the Grant Street apartment until after the birth of their son in 1984. (ECF Docket No. 133-1, ¶ 10, citing Exhibit O, 41:19-42:24.) Therefore, at a minimum, the parties lived together for approximately four years.

While Mrs. Schwartz maintains the relationship between the parties consisted of "predictable, regular, and close" contact, Accuratus disputes the legitimacy of this contact, claiming Mr. Schwartz's employment with Accuratus and his relationship with Mrs. Schwartz only overlapped by a few months. According to Accuratus, Mrs. Schwartz testified she visited Mr. Schwartz at his apartment and "only stayed overnight . . . 'two or three times maybe.'"[3] (ECF Docket No. 123-1, at 4.) "Despite the factual allegations set forth in the Amended Complaint, Mrs. Schwartz clearly was not co-habitating with Mr. Schwartz and Mr. Altemose while Mr. Schwartz worked at ACC up to July 1979 or prior to the Plaintiffs getting married in June 1980." (Id.) Accuratus disputes Mrs. Schwartz's status as an overnight guest and disputes

---

[3] Defendant regularly cites to their "Statement of Undisputed Facts," however, many of the purported "undisputed facts" are heavily disputed by Plaintiffs.

whether she was a roommate "sharing living space and housework" with Mr. Altemose as initially pled. (Id. at 19.) Accuratus also cites Mrs. Schwartz's testimony regarding her lack of exposure to the toxin while washing clothes, stating: "She testified that she never washed any of Mr. Schwartz's work clothes while he was employed at ACC, that she never washed any of his sheets or towels while he was employed at ACC, and that she never did any vacuuming or cleaning of the apartment while Mr. Schwartz was employed at ACC." (Id. at 5.)

Further, Mrs. Schwartz testified "she never washed any of Mr. Altemose's work clothes that he wore to ACC, and only occasionally washed his towels after she married Mr. Schwartz in June 1980 and moved into the Grant Street apartment." (Id., citing Statement of Undisputed Facts at ¶¶ 5-6.) Following the move downstairs, Mr. Altemose alleges he never spent time in the common areas because he felt "uncomfortable." (ECF Docket No. 123, ¶ 9, citing Exhibit C, 88:7-89:1, 89:22-23.) "I really didn't go into their living quarters at all downstairs . . . I felt very uncomfortable with the situation so I was kind of like – I'd come home, you know, change clothes, use the bathroom and I would go off with my friends, so I really wasn't home much at all." (ECF Docket No. 123, Exhibit C, 88:9-89:1.) Furthermore, Mr. Altemose testified he ceased being roommates with the Schwartzes in the summer of 1982, which is contrary to the Schwartzes testimony. (ECF Docket No. 123-2, citing Docket No. 123, Exhibit C, 89:14-17.)

Accuratus advocates against extending take-home liability on the part of an employer to anyone other than a *family member* of an employee. (Id. at 24.) (emphasis added) Accuratus asserts that no court in this country has recognized Plaintiffs' current concept of take-home liability against an employer. (Id.) "In fact, the expansive take-home liability exposure theory of liability advanced by Mr. and Mrs. Schwartz is at odds with the decisions of a majority of out of state courts that have declined to recognize any take-home liability whatsoever." (Id., citing

17

*Gillen v. Boeing Co.*, 40 F.Supp.3d 354, 541 (E.D. Pa. 2014); *Riedel v. ICI Americas, Inc.*, 968 A.2d 17, 18-19 (Del. 2009).)

As this Court recognized in its March 30, 2017 Opinion with regards to "considerations of fairness and policy . . . the need to sort out causation will provide some limits on toxic substance take-home liability." (ECF Docket No. 97, at 10-11.) As we noted, given the known problems with minor exposure to beryllium, it may be possible that a stranger may be harmed by coming into contact with a beryllium worker. However, that stranger "is unlikely to even figure out how she was exposed, let alone prove it in court." (Id. at 11.) Further, as Accuratus preserves its argument regarding the distinction between domestic norms of 2017 and those of the 1970s, this Court "has given no weight to the present-day realities of non-married cohabitation, which Plaintiffs emphasize and Defendants decry as inapplicable to a claim for conduct a few decades ago." (Id.) This Court only recognizes the fact that nearly "all people at all times have close relationships with others, have regular contact with others in their homes, and in most cases live with others who share space and housework." (Id.) Given this information, it may be reasonably foreseeable to a Defendant employer working with a particularly insidious toxin that material carried home on an employee's clothes may harm someone at that home (i.e. Mrs. Schwartz) who is a romantic partner or roommate sharing living space and housework.

Clearly, issues of material fact exist regarding the relationship of the parties and Mrs. Schwartz's foreseeability as a plaintiff. Based on the evidence presented, it appears Mrs. Schwartz had "predictable, regular, and close" contact with Mr. Schwartz and/or Mr. Altemose. This Court will not disrupt the sound reasoning that has already been applied in this very case; we find that a girlfriend making frequent visits and having physically intimate contact with an

Accuratus employee "is not as a matter of law too remote to entail foreseeability and create a duty." As a matter of law, given the genuine issues of material fact as to Accuratus' liability, a grant of summary judgment in favor of Defendant is not appropriate at this time.

### 4. Successor Liability of Accuratus

Under New Jersey law, when one company "sells or otherwise transfers" all of its assets to another company, the purchasing company is not liable for the seller's debts and liabilities, including those arising out of the seller's tortious conduct – also known as successor non-liability. *Ramirez v. Amsted Industries, Inc.*, 431 A.2d 811, 815 (N.J. 1981); *see also Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir. 1993). Under this rule, Accuratus would not be held liable for Mrs. Schwartz's injuries. However, there are four exceptions to successor non-liability recognized in New Jersey: "(1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities." *Id.* The New Jersey Supreme Court created a fifth exception, referred to as the "product line" exception: "where one corporation acquires all or substantially all the manufacturing assets of another corporation . . . and undertakes essentially the same manufacturing operation as the selling corporation." *Id.* at 825.

The New Jersey Supreme Court cautions against a strict interpretation of the traditional corporate law approach as it leads to a narrow application of the above exceptions to non-liability. *Id.* at 816. A strict interpretation, the New Jersey Supreme Court advises, could lead to an unwarranted emphasis "on the form rather than the practical effect of a particular corporate transaction." *Id.* "The principal exceptions to nonliability outlined in *McKee* condition

successor liability on a determination of whether the transaction can be labeled as a merger or a *de facto* merger, or whether the purchasing corporation can be described as a mere continuation of the selling corporation." *Id.* (citing *McKee v. Harris-Seybold Co., Division of Harris-Intertype Corp.*, 264 A.2d 98 (N.J. Super. Ct. L. Div. 1970). Therefore, according to the New Jersey Supreme Court, "it appears a corporate successor can no longer avoid liability by simply structuring a cash-for-assets sale." *Woodrick v. Jack J. Burke Real Estate, Inc.*, 703 A.2d 306, 313 (N.J. Super. Ct. App. Div. 1997).

      a.   A genuine issue of material fact exists regarding Accuratus' liability as a successor to ACC.

Ostensibly, Plaintiffs would like this Court to view the transaction between Accuratus and ACC as a *de facto* merger or consolidation, rather than a pure asset purchase. The Second Circuit in *Cortland Specialty Co. v. Comm'r of Internal Revenue*, 60 F.2d 937 (2d Cir. 1932) distinguished "a sale of assets from reorganization, merger and consolidation, stating that the latter indicated corporate readjustments of existing interests, whereas in the former the vendor corporation parts with its interest for cash and receives nothing more." Plaintiffs contend that at least three of the five exceptions to successor non-liability apply: 1) whether Accuratus assumed the liabilities at issue when it purchased ACC; 2) whether Accuratus was/is merely a continuation of ACC; and 3) whether Accuratus manufactured the same products as ACC – i.e. product line exception. Plaintiffs ask this Court to apply exceptions one, three, and five from the above list of exceptions recognized by the New Jersey Supreme Court. We will discuss each in turn.

*i. Assumption of debts and liabilities exception*

Accuratus defends against successor liability on the premise that it did not agree, expressly or implicitly, to assume ACC's debts and liabilities. (ECF Docket No. 123-1, at 9.)

20

However, according to the Asset Purchase Agreement, Accuratus contracted to assume ACC's debts and liabilities: "At the Closing, Accuratus will assume and be responsible for the liabilities and obligations of ACC disclosed on <u>Schedule 1</u>. Accuratus will not assume or be responsible for any liabilities or obligations of ACC of any kind, known or unknown, contingent or otherwise, except as specifically disclosed on <u>Schedule 1</u>." (ECF Docket No. 123-1, Exhibit E, at 5.) Therefore, Accuratus assumed all debts and liabilities as specified in "Schedule 1." Accuratus argues that the language in this exception is straightforward in its application because, as our Circuit identified, "it is based on the terms of the parties' agreement in accordance with the strict law of contractual interpretation." (Id. at 9, citing *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006).)

However, both parties dispute whether Accuratus provided a copy of "Schedule 1." While this Court agrees with Accuratus' application of the law, this Court finds it troubling that Accuratus cites the Asset Purchase Agreement and "Schedule 1" as proof that Accuratus "did not agree to an express assumption of ACC's debts of obligations." (ECF Docket No. 123-1, at 9.) Exhibit E of Accuratus' motion does not appear to contain "Schedule 1." According to Plaintiffs, Accuratus "had always claimed that it 'could not find 'Schedule 1' to the agreement'"; yet, Accuratus now alleges that a document it produced on September 28, 2017 is "Schedule 1."[4] (ECF Docket No. 136, citing ECF Docket No. 133, Exhibit B 141:3-142:3.) Accuratus maintains that the "Schedule 1" produced through discovery proves Accuratus did not expressly agree to assume ACC's debts or obligations. Conversely, Plaintiffs argue this purported

---

[4] Plaintiffs question the credibility of the purported "Schedule 1." Plaintiffs allege Accuratus now provides a copy of "Schedule 1" although Mr. Ray Tsao, Accuratus' general manager and president, testified he could not find it when deposed in 2014. While Plaintiffs now object to the representation of the document as "Schedule 1," Accuratus argues the company produced the document on September 28, 2017, yet Plaintiffs never objected to that document, questioned its authenticity, or requested that Accuratus produce Mr. Tsao for a follow-up deposition. (ECF Docket No. 137.)

"Schedule 1" "is merely a handwritten list of ACC's corporate creditors, which is routinely provided to a purchasing company after a sale," and does not reveal any liabilities assumed by Accuratus. (Id. at 2-3.)

While issues of credibility or authenticity remain, it is not the province of this Court to determine such issues at this stage. Although the Asset Purchase Agreement was at the heart of the Accuratus sale and purchase, questions remain as to the authenticity of "Schedule 1." Given the dispute regarding the debts and liabilities, summary judgment is not proper.

### ii. Mere continuation or de facto merger exception

The "mere continuation" exception is similar to the "*de facto* merger" exception analysis in that much of the same evidence is relevant to each determination; both arise where there is continuity of identity between the buyer and seller. *Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006) (citing *Luxliner*, 13 F.3d at 73). "Mere continuation" analysis, according to our Circuit, "focuses on whether the new corporation is merely a restricted form of the old, while *de facto* merger analysis inquires whether a transaction – though structured as an asset purchase – factually amounts to a consolidation or merger." *Id.* at 465. Because these exceptions overlap, they are often treated in unison. *Woodrick*, 703 A.2d at 312.

In order to determine whether "mere continuation" (or *de facto* merger) applies, we must consider four factors: "1) continuity of management, personnel, physical location, assets, and general business operations; 2) cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; 3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor: and 4) continuity of ownership/shareholders."[5] *Id.* However, not all factors need to be present for

---

[5] Our Circuit has applied similar factors: "whether stock was part of the purchase price for the assets; whether there was a continuity of business, control or management between the two corporations; and whether the alleged

continuation. *Id.*; *see also Luxliner*, 13 F.3d at 73. While these above factors are important, according to the New Jersey Superior Court, "the crucial inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.'" *Id.* (citing *Luxliner*, 13 F.3d at 73).

The first factor, continuity of management, personnel, physical location, assets, and general business operations, is disputed by both parties. Accuratus maintains it did not acquire ownership or merge with ACC; it allegedly only acquired *some* of its assets. (ECF Docket No. 123-2, ¶¶ 13-14, citing Exhibit D, 20:10-21:18.) (emphasis added) Specifically, Mr. Tsao testified: "I did not acquire that company. I acquired the assets from Accuratus Ceramic Corporation." (ECF Docket No. 123, Exhibit D, 21:7-9.) However, according to Plaintiffs, the Asset Purchase Agreement reveals that Accuratus did acquire all of ACC's assets. (ECF Docket No. 133-1, ¶ 14.) "Indeed, the agreement reveals that Accuratus took ownership of all of ACC's products, inventory, and manufacturing supplies, as well as all of ACC's copyrights, patents, trademarks, trade names, trade secrets, 'marketing and manufacturing know-how,' research and development files, media materials, litigation files, and computer software programs." (Id., citing ECF Docket No. 133, Exhibit A.) In addition to the assets listed above, "Accuratus also bought ACC's name and the goodwill associated with its name, as well as all of ACC's marketing, distribution, and administration materials." (Id.) The Court would note that taking the entirety of the corporate assets is a very significant factor to be considered.

Mr. Tsao also testified, following the execution of the Asset Purchase Agreement, Accuratus assumed ACC's lease and continued to operate from ACC's facility. (ECF Docket No. 133, Exhibit B, 132:24-133:10) While Accuratus claims it was and is a "separate new and

---

successor corporation assumed the debts of the predecessor corporation." *Luxliner*, 13 F.3d at 73 (citing *McKee*, 264 A.2d 98, 104, (N.J. Super. L. Div. 1970)).

different entity from ACC," Plaintiffs provide this Court with evidence that many of the same employees that worked at ACC continued to work for Accuratus following the sale of the company. According to Mr. Tsao's deposition, by August 17, 1983, approximately seven or eight employees worked for ACC; when Accuratus purchased ACC, approximately seven ACC employees remained employed by Accuratus. (Id. at 135:5-15.)

Most damning to Accuratus, however, is its use of "Accuratus Ceramics" following the purchase of ACC – short for Accuratus Ceramics Corporation. (Id. at 135:17-139:4; *see also* ECF Docket No. 133, Exhibit A, at 4, Section 1.4.) "Accuratus held itself out to the world as Accuratus Ceramic Corporation. In fact, shortly after Accuratus purchased ACC it applies for an employer identification number. On that application Accuratus listed its trade name as Accuratus Ceramics Corporation." (ECF Docket No. 133, ¶ 15, citing Docket No. 133, Exhibit F.) Moreover, letters written to Accuratus were addressed as "Accuratus Ceramics Corporation," and letters written by Accuratus contained the Accuratus Ceramics letterhead. (Id. at 12, citing Exhibit G.) Yet, Mr. Altemose – the Schwartzes' roommate – testified that the product line changed and differed from that of ACC after the purchase by Accuratus. (ECF Docket No. 123, Exhibit C, 133:8-15.)

With regards to the second factor, cessation of ordinary business and dissolution of the acquired corporation as soon as possible, Accuratus took ownership of all of ACC's patents, trademarks, trade names, copyrights, furnishings, machinery, fixtures and equipment. Under the *de facto* merger doctrine, an essential characteristic of a merger is that one corporation survives while the other ceases to exist. *Berg*, 435 F.3d at 470. While Plaintiffs argue the purchase of ACC by Accuratus constituted a "mere continuation," no evidence has been presented that ACC ceased to exist after Accuratus' purchase. Accuratus contends it "intended to thereafter sever all

connections, historical, legal and otherwise, between [itself] and ACC." (Id. at 11.) Therefore, this factor must weigh against finding a "mere continuation" as there is no evidence of dissolution.

The third factor, assumption by the successor of the liabilities, has been addressed in the prior subsection. As noted above, there is a genuine issue of material fact as to the authenticity of the recently produced/discovered "Schedule 1" of the Asset Purchase Agreement which cannot be resolved by this Court at this stage. Therefore, this Court will not make a determination as to whether this factor weighs in favor of finding successor liability.

The fourth factor, continuity of ownership, weighs in favor of potentially finding successor liability; however, genuine issues of material fact remain. According to the District of New Jersey, "Plaintiff 'must prove that the purchasing corporation represents merely a 'new hat' for the seller.'" *Jorgensen & Company v. Sutherland*, 2017 WL 4682281, at *3 (D. N.J. 2017). Accuratus denies that any management personnel from ACC carried over to Accuratus following the purchase of ACC. Mr. Tsao testified that "none of the management team of Accuratus at any time is or was a member of the management of ACC." (ECF Docket No. 123-1, at 13, citing Exhibit D, 11:21-24; 17:1-11; 36:8-10; 37:10-13; 39:10-41:1; 184:5-12.) Plaintiffs refute this and argue the management team at ACC continued operating as the management team at Accuratus. Specifically, William Lammers – one of the four equitable owners before and after the sale – remained as an equitable owner with minimal change to his responsibilities. (ECF Docket No. 133, at 12, citing Exhibit I, 29:1-30:10.) Further, Plaintiffs allege Accuratus entered into a consulting agreement with ACC's former owner, Jay Comeforo. (Id. at 13, citing Exhibit A, at 28, Section 6.7.)

Accuratus cites *Jorgensen* as support for its argument that Accuratus should not be held liable because the sale and purchase of ACC did not amount to a "mere continuation" or "*de facto* merger." The court in *Jorgensen* applied the four factor test used by our Circuit and concluded "the scale does not tip in favor of a de factor merger." *Id.* at *3. However, *Jorgensen* is uniquely distinct from our case in that the purchasing company and selling company coordinated the asset purchase by: forwarding letters to customers informing them of the asset purchase agreement; informing customers that the transaction was not a merger, and that the company was purchasing the assets but not the liabilities; placing notice on the website informing visitors of the asset purchase; changing the e-mail addresses of all employees hired from the selling company; cancelling all of the seller's contracts with insurance companies and replacing them with contracts between the purchasing company and those insurance companies; and training new employees in the use of the purchasing company's computer system and policies/procedures.

It does not appear that ACC or Accuratus performed any of the above measures. Therefore, there is clearly a genuine issue of material fact as to whether the purchase of ACC constituted a "mere continuation" or "*de facto* merger."

### iii. Product line exception

Additionally, the New Jersey Supreme Court expanded successor liability by adding a fifth exception: "[W]here one corporation acquires all or substantially all the manufacturing assets of another corporation . . . and undertakes essentially the same manufacturing operation as the selling corporation." *Ramirez*, 431 A.2d at 825. However, the court also stated: "the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its

predecessor." *Id.* This Court previously dismissed Plaintiffs' strict products liability claim against Accuratus concluding strict products liability requires a completed and sold product. (ECF Docket No. 65, at 19.) In addressing the "product line" exception, this Court will not disturb its previous decision.

Accuratus argues the fifth exception is inapplicable as it "only" applies in products liability cases. (ECF Docket No. 135, at 7.) While this Court recognizes that *Woodrick* states "[a] fifth exception has been adopted in products liability cases," this Court does not interpret that clause as precluding the use of the fifth exception in non-products liability cases. For example, our Circuit in *Leo v. Kerr-McGee Chemical Corp.*, 37 F.3d 96 (3d Cir. 1994), applied the "product line" exception in a toxic tort case similar to this one. Therefore, this Court will address the "product line" factors established in *Ramirez*.

The court in *Ramirez* determined that the successor corporation could be liable for injuries caused by its predecessor's defective product on three grounds: "(1) the sale of the enterprise virtually destroyed the injured party's remedy against the original manufacturer; (2) the successor has the ability to assume the original manufacturer's risk-spreading role; and (3) it is fair to require the successor to assume a responsibility for defective products as that responsibility was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." *Ramirez*, 431 A.2d at 820.

As this Court addressed, a genuine issue of material fact exists regarding the type of goods Accuratus manufactured following the purchase of ACC. Accuratus' articles of incorporation provide the company's intended purpose is "to design, manufacture and sell precision machine-tooled ceramic components or any other products made with substance beryllium oxide . . . ." (ECF Docket No. 133, at 15, citing Exhibit J.) Undoubtedly, it appears

Accuratus engaged in the same or similar work as ACC – manufacturing ceramic components and machining beryllium oxide – following its purchase of the company. (ECF Docket No. 133, at 15.) Therefore, it would appear as if Accuratus maintained the same or similar product lines as ACC.

In applying the three rationales adopted in *Ramirez*, our Circuit declined to "stretch *Ramirez* far beyond its original scope." *Leo*, 37 F.3d at 102. The first factor, destruction of the injured party's remedy, according to our Circuit, merely "focuses on the need for imposition of successor liability rather than whether it is fair to impose it"; therefore, while a selling corporation's viability to respond in damages to the injured party is necessary, it is not a sufficient basis on which to place liability on the successor. *Id.* at 99. While their remedies against ACC could be destroyed by Accuratus' purchase, Plaintiffs' "loss of remedy" is not dispositive under the "product line" exception.

The second factor, a successor's ability to assume the predecessor's risk-spreading role, involves the purchaser's ability to acquire insurance for possible liabilities associated with the seller's products. *Id.* at 100. In *Leo*, our Circuit concluded the successor could not have the capacity to assume the risk-spreading role for a toxic tort arising from the predecessor's operations at a facility where the successor never acquires or controls. *Id.* "Overall, we cannot conceive that the Supreme Court of New Jersey would believe that the purchaser of a product line not acquiring the real estate at which the product was manufactured reasonably could assume its predecessor's risk spreading role for toxic torts." *Id.* In assessing the risk of toxic tort liability for activities in the past, the court concluded "it would be more likely that the successor could acquire insurance coverage for the discrete risks flowing from injuries caused directly by a predecessor's product than for environmental risks from conditions on real estate." As Plaintiffs

argue, and Accuratus points out, Accuratus obtained its own liability insurance which in theory could assume ACC's risk-spreading role. (ECF Docket No. 133, at 15.)

The third and final factor, that it is fair to require a successor to assume a responsibility for defective products as that responsibility is a burden necessarily attached to the successor's acquisition of the predecessor's good will, could apply in the instant case. While it did not apply in *Leo* given the good will acquired resulted in the product line it acquired – gas mantles and not the site where it manufactured the product – here, it is certainly fair for Accuratus to assume responsibility as it knew the danger of beryllium. *Leo*, 37 F.3d at 101. "Nevertheless, Accuratus assumed these burdens and at the same time enjoyed the goodwill associated with ACC's business." (ECF Docket No. 133, at 15.)

Given the dispute of material facts regarding three of the five exceptions to successor non-liability, summary judgment as to this issue would not be proper.

## III.   **CONCLUSION**

In the accompanying order, this Court denies Defendant's motion for summary judgment. Genuine issues of material fact exist regarding Accuratus' take-home liability and Mrs. Schwartz's status as a foreseeable plaintiff. Issues of material fact also exist regarding Accuratus' successor liability.

ENT'D FEB 2 1 2018